IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DONOVAN PHIPPS,

    Petitioner,               No. CIV S-07-0087 WBS CHS P

vs.

MIKE EVANS, Warden, et al.,

    Respondents.            FINDINGS AND RECOMMENDATIONS

/

I. <u>INTRODUCTION</u>

        Petitioner Donovan Phipps is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner attacks his convictions for second degree murder, leaving the scene of an accident, and misdemeanor resisting a peace officer in the Butte County Superior Court, case no. CM018760.

II. <u>CLAIMS</u>

        Petitioner makes the following claims:

        A.    He received ineffective assistance of trial counsel;

        B.    The prosecutor engaged in misconduct;

        C.    Witnesses committed perjury;

        D.    His prior strike should not have been used in sentencing;

1

1        E.     Trial publicity deprived him of a fair trial; and

2        F.     He was prejudiced by the accumulation of errors.

Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's petition for habeas corpus relief be denied.

## III.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Facts

#### The Prosecution's Case-in-chief

At approximately 8:00 a.m. on February 24, 2003, Police Officer Curtis Prosise responded to a major collision accident at the intersection of Esplanade and East First Avenue in Chico. The intersection, located in the vicinity of three schools, was a major thoroughfare with "a lot" of pedestrian, bicycle and vehicular traffic. The speed limit on Esplanade was 25 miles per hour when children were present.

At the scene of the collision, Officer Prosise saw a white Ford pickup truck in the northbound lanes of Esplanade with a bent steering wheel and a white Nissan sedan north of the intersection that suffered "major damage." The truck was registered to defendant's parents.

Several people witnessed the events leading up to the collision. Between 7:30 and 7:45 a.m., Peter Mundy was waiting at a traffic light at the intersection of East First Avenue and Main Street. A pedestrian began to cross but suddenly stopped and stepped back. Mundy looked down the street and saw "a smaller pickup" truck that had run a red light "at a high rate of speed."

At approximately 7:30 a.m., Richard Stephens was traveling on Esplanade in the left lane when he saw a white pickup truck approaching him from behind at a "real fast" speed. The truck "swerved" into the right lane and passed Stephens. Stephens believed the truck was traveling erratically and "too fast for all the kids that [we]re in that area."

Between 7:30 a.m. and 8:00 a.m., passenger Rodney Whaley and his girlfriend [Beth Peters] were driving north on Esplanade in her car. She alerted him that she noticed a truck in her rearview mirror traveling "at a high rate of speed." The truck avoided colliding with her car by swerving into the left-turn lane and going around them. The truck passed them, "gained control," and continued "at a high rate of speed" to East First Avenue.

Another car was turning at the intersection of Esplanade and East First Avenue. There was an open lane so the truck could have avoided the car. Instead, the truck collided with the car. The car spun around, the passenger door "flew off," and the driver "flew

2

out of the passenger car door as it was spinning." Whaley got out of his girlfriend's car to check on the driver, Juan Lugo, but found he was already deceased.

Defendant, who had been driving the truck, walked away from the collision. Whaley told him to stop and informed defendant he might have "just killed somebody." Defendant "said he didn't care," told Whaley he "w[ould] kill [him] too," and attempted to fight with him.

Defendant then headed north toward a hospital with Whaley at his side. When they reached the emergency window, Whaley told the hospital to call police. Whaley continued walking with defendant past the hospital.

Officer Greg Rogers arrived in full uniform to the location where defendant and Whaley were walking. When Officer Rogers got close enough for defendant to hear him, he said, "Stop, police." Defendant did not obey and kept walking. Rogers told defendant to get on the ground two times, but defendant still ignored him. Rogers pulled out his pepper spray and told defendant to stop once more. When defendant ignored him again, Rogers sprayed the pepper spray into defendant's face. Defendant walked even faster toward the intersection. Rogers pulled defendant to the ground and told him to stay down and stop resisting. Defendant stood up and broke free. He was eventually taken into custody with the help of two additional officers and two citizens.

Defendant was admitted to the hospital that day with head trauma. He tested negative for drugs and alcohol.

The next day Officer Prosise transported defendant from the hospital to the Chico Police Department to take his statement. Defendant was "fairly difficult to understand," would not directly answer his questions, and seemed to change subjects. He knew he had been in a traffic accident and thought he collided with a bus.

### The Defense

Susan Parlari-Yates saw the collision while stopped at the intersection of Esplanade and East First Avenue. When she got out of her car, she heard defendant mumbling incoherently and repeating the word "Satan." She then saw defendant walk into the center of four lanes of traffic, make a "crossed sign" with his fingers, turn around in a circle two or three times, and begin "clawing at the sky."

According to defendant's mother, Colleen Phipps, defendant had a long history of mental illness. In the latter part of February 2003, defendant started showing signs of relapse. On February 23, he threw furniture into the street, screamed loudly, and babbled incoherently. Defendant calmed down after the sheriffs left the scene.

Prior to trial, clinical psychologist Donald Stembridge interviewed

3

defendant at jail in June, reviewed documents pertaining to his criminal case, and reviewed his psychological evaluations and mental health records. He testified he believed defendant was in the midst of a bipolar episode on the day of the accident. Defendant was experiencing "fairly severe depression" as his marriage had failed and his relationship with an ex-girlfriend "had never taken off." On the day of the accident, defendant "found himself without cigarettes" and took his father's truck to purchase some. When his ATM card did not work, defendant interpreted this as another sign of rejection. He went back home and retrieved his checkbook, only to discover the store did not accept checks. At that point, defendant was "very upset."

Dr. Stembridge also believed defendant "may have been" experiencing delusions or hallucinations on the day of the accident because defendant was "speaking gibberish" at the hospital and was given antipsychotic medication. However, there did "not appear to be any credible evidence" that hallucinations and or delusions interfered with defendant's ability to understand he was driving his car "in a reckless fashion and in excessive speed." Moreover, defendant told Dr. Stembridge he had not experienced hallucinations and said his behavior at the hospital was a result of severe head trauma and shock.

Defendant also told Dr. Stembridge he was driving 50 miles per hour before the collision, knew speeding was wrong but was not afraid of speeding because he did not think he would get caught, and was aware of the possibility of getting into an accident.

It was Dr. Stembridge's opinion that defendant "[m]ay seek out risky or exciting activities to make himself feel better." He believed defendant's manner of driving on the day of the accident was consistent with that sort of risky activity.

Dr. John Podboy also interviewed defendant in December 2003 and reviewed his mental health history. In Dr. Podboy's opinion, defendant suffered a "break with reality" on the day of the accident due to paranoid delusional disorder, which included a belief that a higher power was protecting him. This may have left him with the inability to appreciate the risk his driving created. [FN] Dr. Podboy acknowledged that most of defendant's medical reports indicated that prior substance abuse either triggered or exacerbated defendant's psychological condition and there was no indication defendant was under the influence of any controlled substance at the time of the accident.

> FN. In contrast, Dr. Stembridge found no evidence defendant believed he was being guided by a higher power on the day of the accident.

Rebuttal

Psychologist Paul Wuehler interviewed defendant three times. On February 5, 2004, defendant came to his office "under the order of

4

> the court." When Dr. Wuehler asked defendant "routine questions for competency to stand trial," defendant became "very defensive, upset, and chose not to stay in the interview and left."
>
> On March 5, 2004, Dr. Wuehler completed an examination of defendant. He believed defendant was "trying to be in control of the outcome of the interview."
>
> On July 8, 2004, Dr. Wuehler examined defendant for a third time. He thought defendant was attempting to use "key words" and "feed [Dr. Wuehler] symptoms that [defendant] wanted [Dr. Wuehler] to see." Defendant said on the day of the accident he was " 'bottling [his] emotions,' " a "phrase [he] learned in therapy,' " and heard his former girlfriend's voice over the radio. He left the accident to get medical help. He did not suggest he felt confused after the accident and did not say God was protecting him.
>
> In Dr. Wuehler's opinion defendant was suffering from depression, psychological stress and a "schizo-affective kind of problem." Defendant's mental defect or disease did not incapacitate him on the day of the accident and "did not affect his judgment enough to cause him to be unable to think straight."

/////

Opinion, California Court of Appeal, Third Appellate District, December 30, 2005, lodged with this court with respondent's answer as lodged document 1, at 2-8. At the conclusion of the trial, a jury convicted petitioner of second degree murder, leaving the scene of an accident and misdemeanor resisting a peace officer. Id. at 1. The trial court sentenced him to an aggregate term of 30 years to life in state prison. Id.

B. Post Trial Proceedings

1) State Appellate Review

Petitioner appealed his conviction to the California Court of Appeal. On December 30, 2005, that court affirmed the conviction. Answer, Lodged Doc. 1 at 2. He then filed a petition for review with the California Supreme Court on February 10, 2006. Answer, Lodged Doc. 2. That court denied his petition on March 15, 2006. Answer, Lodged Doc. 3.

2) Habeas Review

On November 16, 2007, petitioner filed a petition for writ of habeas corpus in the state appellate court. Answer, Lodged Doc. 4. That court denied that petition on December 13, 2007. Answer, Lodged Doc. 5. He then filed another petition for review in the California

Supreme Court on December 24, 2007. Answer, Lodged Doc. 6. On January 30, 2008, that court again denied his petition. Answer, Lodged Doc. 7.

IV. APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

/////

/////

6

V.   DISCUSSION OF PETITIONER'S CLAIMS

   A.   Ineffective Assistance of Trial Counsel[1]

      1)   Description of Claim

Petitioner claims that he received ineffective assistance of trial counsel. He raises several issues including the failure to waive the preliminary hearing, the substitution of a particular counsel, and the failure to investigate and call witnesses. Petition at 6,19.

      2)   Applicable Law

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Id. at 687-88. After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally, competent assistance. Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003). In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689). There is in addition a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. Strickland, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

---

[1] Petitioner's claims 1, 3, and 7 all concern ineffective assistance of trial counsel and will therefore be combined into this one claim.

7

been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

/////

           3)    Discussion

Petitioner raises the following issues with respect to the ineffective assistance of counsel:

           a)    Failure to waive the preliminary hearing

Petitioner argues his trial counsel's failure to waive his preliminary hearing allowed police officers to testify against him. Petition at 6. He appears to believe that the second degree murder charge was added as a result of this testimony. Id.; Reply at 6.

If the officers had not testified at the preliminary hearing they certainly would have testified at the trial. The preliminary hearing did not affect the admission of that testimony. Competent trial counsel may therefore have decided to use the preliminary hearing to petitioner's advantage and question these key witnesses prior to trial.

Further, it is more likely that the prosecutor added the murder charge after gathering more evidence, and not as a result of the hearing. Nevertheless, even if the prosecutor did add the murder charge as a result of that hearing, that is within the prosecutor's discretion and not something petitioner's trial counsel could have avoided.

Finally, the role of defense counsel is to defend a client. Petitioner has not shown that his counsel was ineffective in defending him. Waiving the hearing would only have denied

his counsel the opportunity to question witnesses while moving the matter one step closer to trial.

    b) <u>Substitution of counsel</u>

  Petitioner argues that he retained the Chase Law Group believing Mr. Eyster would be trial counsel. Petition at 6, 19. Instead his trial counsel was Mr. Kevin Hyatt, also of the Chase Law Group. <u>Id.</u> at 19. Petitioner argues that the substitution was "a 'bait and switch' tactic commonly used by nefarious people to swindle unsuspecting victims." <u>Id.</u>

  Whether the Chase Law Group engaged in a "bait and switch" by itself is not sufficient to show a deficient performance by Mr. Hyatt or prejudice to petitioner.

    c) <u>Witnesses</u>

  Petitioner makes multiple claims that trial counsel failed to call witnesses who could testify about whether his vehicle was swerving, changing lanes or had an open lane to avoid the collision. <u>Id.</u>

  All of this argument ignores that the crucial issue in his trial was not vehicle control, lane position, or accident avoidance but rather whether his decision to travel at a high rate of speed through a busy thoroughfare indicated intent to commit murder. The testimony of the witnesses identified by petitioner would not have supported his defense on that issue. Further, petitioner has only provided his assertion that these witnesses would testify to these statements and has not provided any sworn declarations or other independent evidence.

    d) <u>Objections</u>

  Petitioner argues his trial counsel failed to make "proper objections and requests at trial" and failed to "challenge" several of the prosecution's arguments with respect to Mr. Whaley's testimony <u>Id.</u> at 20-21. He does not provide the legal bases for these objections or challenges.

  With respect to the argument that trial counsel did not challenge Mr. Whaley's testimony, is not supported by the record. During closing argument, Petitioner's trial counsel

9

1  stated:

> I think Mr. Whaley's testimony, for reasons that I am not going to waste time discussing, needs to be discounted. Him and Beth Peters seem to be, for reasons known only to them, to appease the prosecution with their testimony.

/////

RT at 303. Counsel was clearly attempting to discredit Mr. Whaley's testimony by implying that it was the result of a wish to gain favor with the prosecution and was therefore not credible.

          e)     <u>Failure to pursue mental defect or imperfect self defense</u>

Petitioner argues his trial counsel failed to "investigate, develop and present available psychiatric evidence" in support of an insanity defense or to advise him of the defense of imperfect self defense. Id. at 9.

In fact, trial counsel did initially pursue an insanity defense. Counsel informed the court on April 4, 2003 that he had doubts about petitioner's competence, leading the trial court to order a mental health evaluation. CT 14, 15-16. He was subsequently evaluated by four mental health professionals. CT at 59, 69, 262, 267, 270, 304, 318. As a result of those evaluations, trial counsel decided to withdraw the plea of not guilty by reason of insanity because given the reports the defense would have been "without substantial support." RT at 47. Petitioner even joined in the withdrawal, spontaneously proclaiming "[w]ithdraw the NGI. I was agreeing to it." Id. Petitioner has not provided any evidence that he was actually legally insane.

With respect to the defense of imperfect self defense, petitioner has not shown that his trial counsel's decision to pursue a not guilty defense was unreasonable. While the mental health reports apparently could not support an insanity defense, trial counsel used those reports to undermine the prosecutor's attempt to prove intent, a reasonable strategy given the facts. Petitioner has not shown a reasonable probability that the jury's verdict would have been different had he raised a defense of imperfect self defense instead of a not guilty defense.

          4)     <u>Conclusion</u>

Despite raising numerous complaints about his trial counsel's performance,

10

petitioner is unable to show one instance of deficient performance, let alone prejudice. He is therefore not entitled to relief on this claim.

   B.   Prosecutorial Misconduct

       1)   Description of Claim

Petitioner argues the prosecutor knowingly used false statements, denying him his right to a fair trial. Id. at 24. He specifically claims that the prosecutor allowed Mr. Whaley to testify that petitioner said "I know who you are and I'll get you next" and "I will kill you too," despite knowing that petitioner never made those statements. Id. He argues that the prosecutor "must have known these statements were false and therefore [the witness's] entire testimony is suspect and should have been discredited." Id.

       2)   Applicable Law

"It is an established tenet of the due process clause that 'the deliberate deception of the court by the presentation of false evidence is incompatible with the rudimentary demands of justice.'" United States v. Rewald, 889 F.2d 836, 860 (9th Cir. 1989) (quoting United States v. Endicott, 869 F.2d 452, 455 (9th Cir. 1989)). "[A] conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict." United States v. Bagley, 473 U.S. 667, 680 n.9 (1985). This rule applies even where the false testimony goes only to the credibility of the witness. Napue v. Illinois, 360 U.S. 264, 269 (1959.) There are two components to establishing a claim for relief based on the introduction of perjured testimony at trial. First, the moving party must establish that the statements were false. United States v. Polizzi, 801 F.2d 1543, 1549-50 (9th Cir. 1986). Second, the movant must demonstrate that the prosecution knowingly used the perjured testimony. Id. Mere speculation regarding these factors is insufficient to meet movant's burden. United States v. Aichele, 941 F.2d 761, 766 (9th Cir. 1991).

In the context of a petition for relief under 28 U.S.C. § 2255 the Ninth Circuit Court of Appeals has held that proof of knowledge by the prosecution is required to support a

11

1  claim of denial of due process based upon the admission of prejudicial perjured testimony in a
2  criminal trial.  See Marcella v. United States, 344 F.2d 876, 880 (9th Cir. 1965) ("Before a
3  sentence may be vacated on the ground of perjured testimony, the movant must show that the
4  testimony was perjured and that the prosecuting officials knew at the time such testimony was
5  used that it was perjured."); Black v. United States, 269 F.2d 38, 43 (9th Cir. 1959); Taylor v.
6  United States, 221 F.2d 228 (9th Cir. 1955).  See also Ortiz v. Stewart, 149 F.3d 923, 936 (9th
7  Cir. 1998) ("If a prosecutor knowingly uses perjured testimony or knowingly fails to disclose
8  that testimony is false, the conviction must be set aside if there is any reasonable likelihood that
9  the false testimony could have affected the jury verdict.").

   3) Discussion

Petitioner argues that the statements at issue were never mentioned in Mr. Whaley's hand written police statement and implies that he added these statements in exchange for favorable dispositions of four charges of driving on a suspended license. Id. at 24. He argues that the prosecutor "must have known that these statements were false" and therefore the "entire testimony is suspect and should have been discredited." Id. He reaches this conclusion based on the assumption that the "prosecutor surely must have interviewed Mr. Whaley prior to his testifying and may have suggested these words to Whaley." Reply at 14.

The absence of these statements in Mr. Whaley's handwritten report does not prove that the prosecutor knowingly used perjured testimony or even that the statements were false. Similarly, petitioner's that the prosecutor "may have suggested these words" is simply wishful conjecture.

During Mr. Whaley's testimony the prosecutor asked him to review his police statement. RT at 108-09. After review the prosecutor asked Mr. Whaley if he remembered if Petitioner made any additional statements. Id. at 109. Mr. Whaley stated he did and that Petitioner told him "I will kill you too." Id.

Whether review of his statement refreshed his memory, or even if Mr. Whaley

made up these statements, that does not establish that the prosecutor knew the statements were false. This claim is based entirely on assumption and is without factual support. Petitioner has not met the required showing and therefore is not entitled to relief on this claim.

C. <u>Witness Perjury</u>

1) <u>Description of Claim</u>

Petitioner claims that two witnesses committed perjury resulting in a denial of his right to due process. Petition at 11, 28. He argues that Mr. Whaley committed perjury when he testified regarding the statements discussed supra. He also argues that Ms. Peters committed perjury when on direct exam by defense counsel she denied speaking with Mr. Whaley that morning prior to testifying. <u>Id.</u>

2) <u>Applicable Law</u>

A conviction obtained using knowingly perjured testimony violates due process. <u>Mooney v. Holohan</u>, 294 U.S. 103, 112 (1935). It is an established tenet of the due process clause that 'the deliberate deception of the court by the presentation of false evidence is incompatible with the rudimentary demands of justice.'" <u>Rewald</u>, 889 F.2d at 860 (quoting <u>Endicott</u>, 869 F.2d at 455). "[A] conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict." <u>Bagley</u>, 473 U.S. at 680. <u>See</u> <u>also</u> <u>Morales v. Woodford</u>, 388 F.3d 1159, 1179 (9th Cir. 2004) ("The due process requirement voids a conviction where the false evidence is 'known to be such by representatives of the State.'") (quoting <u>Napue</u>, 360 U.S. at 269)). This rule applies even where the false testimony goes only to the credibility of the witness. <u>Napue</u>, 360 U.S. at 269; <u>Jackson v. Brown</u>, 513 F.3d 1057, 1072 (9th Cir. 2008); <u>Mancuso v Olivarez</u>, 292 F.3d 939, 957 (9th Cir. 2002). There are two components to establishing a claim for relief based on the introduction of perjured testimony at trial. First, the moving party must establish that the testimony was false. <u>Polizzi</u>, 801 F.2d at 1549-50. Second, the movant must demonstrate that the prosecution knowingly used the perjured testimony. <u>Id.</u>

1 Mere speculation regarding these factors is insufficient to meet movant's burden. Aichele, 941
2 F.2d at 766.

        3)     Discussion

With respect to Mr. Whaley's testimony, petitioner has failed to establish that the prosecutor knowingly used perjured testimony or that the testimony was false.

With respect to Ms. Peters' testimony, she testified on behalf of the defense that she and Mr. Whaley were on their way to take Mr. Whaley to a drug recovery center on the morning of the accident. RT at 195-96.

At the beginning of her direct testimony, defense counsel asked Ms. Peters if she had "a conversation with Mr. Whaley this morning." Id. at 194. She answered that she did not because she had just arrived at court. Id. After Ms. Peters concluded her testimony, defense counsel called a witness who testified that she had seen Ms. Peters speak with Mr. Whaley that morning, just prior to her testifying. Id. at 221.

While it appears that Ms. Peters may have committed perjury, she was not a witness for the prosecution. Further, the statement was obtained during defense counsel's direct questioning and the prosecutor played no role in the allegedly perjured statement. Immediately after her testimony, Ms. Peters' credibility was impeached by defense counsel and there is no evidence that this issue played any role in the jury's verdict.

It would defy justice to hold the state accountable for the perjured testimony of a defense witness, particularly where the state played no part in the witnesses' perjury, the witnesses' credibility was immediately impeached, and the defendant suffered no prejudice. Petitioner has not met the required showing and is not entitled to relief on this claim.

    D.     Use of The Prior Strike

        1)     Description of Claim

Petitioner claims the use of his prior strike to enhance his prison sentence was error. Specifically he argues that the trial court did not take into account the fact that during "34

1 years he had an unblemished record with the exception of a 3 year period" or that he only

2 received probation for his prior offense. Petition at 33; Reply at 15. He argues therefore that

3 California law "should be modified, fully clarified and above all defined to insure that it is fairly

4 and evenly charged and tried in a court of law or it should be abolished." Petition at 31.

        2) <u>Applicable Law And Discussion</u>

"It is not the province of a federal habeas court to reexamine state court determinations on state law questions." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991). The standard of review for a federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)." <u>Id.</u> So long as a state sentence "is not based on any proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigency, the penalties for violation of state statutes are matters of state concern." <u>Makal v. State of Arizona</u>, 544 F.2d 1030, 1035 (9th Cir. 1976). Thus, "[a]bsent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief." <u>Christian v. Rhode</u>, 41 F.3d 461, 469 (9th Cir. 1994). The Ninth Circuit has specifically refused to consider state law errors in the application of state sentencing law. <u>See</u>, <u>e.g.</u>, <u>Brown v. Mayle</u>, 283 F.3d 1019, 1040 (9th Cir. 2002), <u>vacated</u> <u>on</u> <u>other</u> <u>grounds</u>, <u>Mayle v. Brown</u>, 538 U.S. 901 (2003) (<u>Romero</u> claim "is not cognizable on federal habeas review"). Habeas relief under this claim is therefore foreclosed.

    E.    <u>Trial Publicity</u>

        1)    <u>Description of Claim</u>

Petitioner claims excessive trial publicity deprived him of his right to a fair trial. The entirety of Petitioner's argument consists of quotes from various newspaper articles spanning just after the accident, through the trial, and after his sentencing. Petition at 35. There is no argument or legal analysis.

/////

2) <u>Applicable Law</u>

The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 (1961). <u>See</u> also <u>Green v. White</u>, 232 F.3d 671, 676 (9th Cir. 2000). If prejudicial pretrial publicity makes it impossible to obtain an impartial jury, then the trial judge must grant the defendant's motion for a change of venue. <u>Gallego v. McDaniel</u>, 124 F.3d 1065, 1070 (9th Cir. 1997); <u>Harris v. Pulley</u>, 885 F.2d 1354, 1361 (9th Cir. 1988). However, jurors are not required to be totally ignorant of the facts and issues involved in a case. <u>Irvin</u>, 366 U.S. at 722; <u>see</u> also <u>Murphy v. Florida</u>, 421 U.S. 794, 800 (1975); <u>United States v. Sherwood</u>, 98 F.3d 402, 410 (9th Cir. 1996). It is sufficient if the jurors can lay aside their impressions or opinions and render a verdict based on the evidence presented in court. <u>Holt v. United States</u>, 218 U.S. 245 (1910); <u>United States v. Dischner</u>, 974 F.2d 1502, 1525 (9th Cir. 1992) (issue is whether jurors could impartially judge the defendant, not whether they remembered the case), <u>overruled on other grounds by United States v. Morales</u>, 108 F.3d 1031, 1035 n.1 (9th Cir. 1997).

The Ninth Circuit employs a two-pronged test to determine if a petitioner's rights to due process and a fair and impartial jury have been violated by excessive and unfair publicity. <u>Gallego</u>, 124 F.3d at 1070; <u>Harris</u>, 885 F.2d at 1361; <u>Hart v. Stanger</u>, 935 F.2d 1007, 1014 (9th Cir. 1991). Specifically, a petitioner must show that either prejudice should be presumed or that actual prejudice existed. <u>Turner v. Calderon</u>, 281 F.3d 851, 865 (9th Cir. 2002); <u>Hart</u>, 935 F. 2d at 1014 (citing <u>Murphy</u>, 421 U.S. at 800). Prejudice may be presumed if the record demonstrates the trial venue was saturated with prejudicial and inflammatory publicity about the crime; however, prejudice is presumed only in extreme circumstances. <u>Gallego</u>, 124 F.3d at 1070; <u>United States v. Croft</u>, 124 F.3d 1109, 1115 (9th Cir. 1997). <u>See</u> also <u>Rideau v. Louisiana</u>, 373 U.S. 723 (1963) (prejudice presumed where the case involved the televising of an in-jail twenty minute interrogation of the defendant by the police in which the defendant confessed to the murder for which he was subsequently convicted); <u>Estes v. Texas</u>, 381 U.S. 532 (1965)

1 (prejudice presumed where the press was allowed to sit within the bar of the court and to overrun it with television equipment); Sheppard, 384 U.S. at 357, 362 (prejudice presumed where media accounts contained inflammatory, prejudicial information that was not admissible at trial). Actual prejudice, on the other hand, exists if the jurors demonstrated actual partiality or hostility. See Irwin, 366 U.S. at 728 (actual prejudice found where eight of the twelve empaneled jurors had already formed the opinion that the defendant was guilty, and 268 of the 430 potential jurors were excused for cause because they indicated some degree of belief in the defendant's guilt). Actual prejudice may also be found where the degree of adverse pretrial publicity has created a community-wide sentiment against the defendant, such that the jurors' claims that they can be impartial should not be believed. Id.; Patton v. Yount, 467 U.S. 1025, 1031 (1984).

The duty of a federal court reviewing such a claim in a habeas corpus proceeding is to "make an independent review of the record to determine whether there was such a degree of prejudice against the petitioner that a fair trial was impossible." Harris, 885 F.2d at 1360 (quoting Bashor v. Risley, 730 F.2d 1228, 1234 (9th Cir. 1980)). To this end, a "reviewing court must independently examine the news reports for volume, content and timing." Harris, 885 F.2d at 1360. A court must also consider whether the jurors had such fixed opinions they could not impartially judge the guilt of the defendant. Patton, 467 U.S. at 1035.

3) Discussion

The quotes provided by petitioner read as follows:

- 02/26/2003: "Suspect in fatal crash has history with authorities.";
- 02/27/2003: "Officer recounts earlier encounter with suspect in fatal crash.";
- 03/01/2003 Editorial: "In a refrain that's becoming too common in Butte County, a person with mental illness has inflicted a horrible tragedy on the community.";
- 03/26/2003: "Innocent plea in Esplanade fatal.";
- 06/25/2003: "Witness says driver veered to hit victim in fatal crash." (Followed by recitation of court testimony.);

17

- 07/03/2003 Letter to Editor: "Why do attorneys call an obvious murder an accident?";
- 07/09/2003: citing a witness as stating "it appeared the suspect had intentionally veered his speeding truck into the victim's car.";
- 07/29/2004: noting that case was now before jury and reciting some of the prosecutor's closing arguments.;
- 7/30/2004: "Phipps found guilty of murder 34-year-old faces 32 years to life in hit and run."; and
- 10/14/2004: "Phipps gets life for fatal hit-run crash."

Petition at 35. Because petitioner has only provided quotes, there can be no analysis of the articles.[2]

The jury was empaneled on July 22, 2004. RT at 63. The trial court instructed the jury that they were not to base their decision on any outside source of evidence, bias, prejudice, conjecture, public opinion or public feelings. Id. at 63-64. Only seven of the cited articles were published before the jury was empaneled. Of the ten total articles, eight appear to have been standard news reports. There is no evidence of record that the jury was influenced by any of the newspaper articles.

Petitioner argues that the news reports contained inflammatory statements that he "knew where he was and what he was doing" and that the victim's mother said that Petitioner "should be put away for the rest of his life." Petition at 35. While it is true that inflammatory, prejudicial information that was not admissible at trial is a basis to assume prejudice, neither of these statements qualifies.

The statement that he "knew where he was and what he was doing" is a direct quote from the prosecutor's closing argument and therefore could not have provided the jury with prejudicial information that was not admissible at trial. RT at 292. The statement by the victim's mother provided no information other than her feelings about the appropriate sentence.

---

[2] As petitioner has not provided any copies of these articles, for purposes of this analysis, their existence and accuracy is assumed.

Every jury is aware that the victim's family might well wish to see the defendant punished to the full extent of the law.

Petitioner has not shown that his rights to due process or a fair and an impartial jury were violated by excessive and unfair publicity. He is therefore not entitled to relief on this claim.

### F. Cumulative Error

#### 1) Description of Claim

In a claim consisting of one sentence, petitioner argues that he was prejudiced by each of the errors in this petition and that the accumulation of those errors violated his constitutional rights.

#### 2) Applicable Law

The Due Process Clause of the Fourteenth Amendment encompasses the right to a fair trial. In re Murchison, 349 U.S. 133, 136 (1955). Where the cumulative effect of errors is so prejudicial that a defendant is denied a fair trial, habeas relief may be warranted. See United States v. Necoechea, 986 F.2d 1273, 1282-83 (9th Cir. 1993). However, as the United States Supreme Court has stated:

> The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed. As we have repeatedly stated, "the Constitution entitles a criminal defendant to a fair trial, not a perfect one."

/////

Rose v. Clark, 478 U.S. 570, 579 (1986) (quoting Van Arsdall, 475 U.S. 673, 681 (1986).

#### 3) Discussion

The record reflects that petitioner received a fair trial. He has not established a violation of federal law with respect to any of the individual claims raised in the petition. Moreover, considered in their aggregate, those claims do not suggest the finding of a due process

violation. Petitioner is therefore not entitled to relief on this claim.

## VI. CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 17, 2009

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE